We'll call our first case of the day, United States v. Sergio Velazquez. Good morning, Your Honor. It's Jerry Kaplan on behalf of Sergio Velazquez, the appellant. I reserve four minutes for a rebuttal. That's granted. Thank you, Your Honor. I believe the big issue in this case is the due diligence of the government under the Barker prong, which I will note is number two. Reasonable diligence, correct? Serious effort, reasonable diligence, and how does – I mean, I agree. I mean, I think we all agree that it's a case-by-case decision as to what reasonable diligence is. And how do we – Could you speak up a little bit? Maybe the microphone is – Well, I flew all night, so I'm trying – is that better? That's better. Thank you. All right. And, I mean, what was – it's a case-by-case analysis. What's the blueprint in this particular case for what reasonable diligence should be? The marshals sent a supplemental request to Los Angeles with a list of things that appeared to be, in my opinion, reasonable diligence. Six addresses and names of relatives, et cetera? Correct. They sent it in 2005. They sent the same thing in 2011. In 2005, it's clear when somebody went on vacation or left the marshal's office, they fumbled the ball. They did none of that. All they did was run a data check on NCIC. Actually, that's all they did for five and a half years. Well, let's – let me ask you to start with, to talk about the standard of review. Doggett talks about considerable deference. What does that mean, Mr. Kaplan? Considerable deference to whether or not it was diligence, correct? That's the statement. It says we're to review the district court's decision about government diligence with, quote, considerable deference, unquote. And here the district court says it was enough. It was – but the district court errs with the honorable judge, who I respect, erring, I believe, in his reasoning as to the Los Angeles 2005 investigation. Is there a factual component to that? I guess I'm – this is not a rhetorical question. I really am curious to know what you think the words considerable deference mean. It's not a typical way of phrasing a standard of review, and in Battis our court talked in terms, more traditional terms, of de novo as to an ultimate conclusion of law and clearly erroneous as to factual findings. But that's not the framing the Supreme Court gave it. It talked in terms of considerable deference to the district court's decision about government diligence. So what are we to make of that language? I suppose that assuming there was no error in the factual interpretation, you would get considerable deference. I mean, assuming he says NCIC is all you need to do for five and a half years, and this – and he says that's enough, is this court determining that all we have to do is wait for a guy to be arrested and that's kind of diligence that you should give that kind of respect to? Because if that's the case, then any time they make a due diligence inquiry as to, I checked NCIC once. Have you left out some background facts there? They go and they – at the outset, and they try to check out the one street address they think they've got. They don't find anybody there. And so evidently the government agents choose to do something less aggressive to find him until new information pops. At least Judge Du Bois seems to think that that's not unreasonable given what he views as – and he uses some language that some people might find troubling. He quotes the Sixth Circuit and talks in terms of a transient lifestyle, but he seems to say that's not – given this guy's lack of roots, that's not unreasonable for them to wait for something to kind of pop on the grid before they send people out on stakeouts. What's wrong with that reasoning? The reasoning he used was the marshal's office sent to LA a supplemental request. And when they first went to the residence, they didn't say where is Mr. Velazquez because they didn't want to alert him. Then when they do send the supplemental request because the marshal thinks that's reasonable diligence, he says – the judge says, I may draw an inference that that's reasonable that they did it because they ran an NCIC check. But I know there's an argument against that. Would you comment on Judge Du Bois' view that your client was – there's an inference that he was evading by using a post office, et cetera, because this is a balancing test and we have to look at the factors. So he clearly weighed that, the cause of the delay, in part against your client. All right. Well, let me respond to that. I mean, the people in Los Angeles, you go from apartment to apartment and many of them – I don't know if it's the same in Philadelphia because I don't live here, but many of them, including me with kids, use the principal residence as our parents' house, our brother's house. And then – Did his mother and brother live at that Woodland residence? Yes. Okay. Where did he live? Do we know? He lived in an apartment. I mean, the problem I have is he didn't live in the same apartment every year for five years. So you're saying a post office box is not necessarily evasion? Post office box is almost a common occurrence in L.A., not only for businesses – for people, but for businesses and for many people because their home address is the one they use for DMV, they use for immigration, they use for all these federal and state agencies. Mr. Counsel, isn't it a fact that even as late as 2010 or 2011, he was putting on official documents an address that, in fact, was not his address? It's not where he was living. Isn't that confirmed by the record? He was putting on his home residence address, i.e., where his family was. But he wasn't living there. I agree. But earlier efforts to locate him at that address were futile. He was not, in fact, living there, yet he continued to use it, again, as late as 2010, 2011, as his residence. As a resident, they never even asked the people where he resided. All they did is say he's here. But I agree with you that he used it as his residence, which is not uncommon even with my children in California. But what he did do is have the same P.O. box all that period of time with the DMV, with immigration. I mean, think about a guy trying to evade, because if you use that as the sole factor of evading, I believe you're missing the boat. Because if you take a look. Well, when you say we're missing the boat, part of what we're dealing with here is asking the question through the lens of, quote, considerable deference. I heard. Whether or not it was just off the mark for the district court to look at the fact that your client kept using an address where he did not live as his address. I understand. And to say, you know, he wasn't being found easily, because he didn't want to be found easily. But, you know, he went to immigration. He had the DMV with his post office box. He used the same post office box. His immigration. He changed it later on. Yeah. He did at some point change the post office box. It was in the same. Same place. Same place. It was just a number change. But his same DMV. I mean, he went to hospitals with his kids. He gave fingerprints at immigration. I hear you about the residence. I can't say. That's like saying there's a range. There's a range of behavior. It's true. He wasn't as invisible as some covert operative, perhaps. But the district court said something which sort of feels like a factual finding about he was trying not to be found. He said, the district court said, you know, I don't have to go all the way and say that, but it sure looks like he was trying not to be found. Do we have to give that some credence and some deference? Well, I believe the case you cite gives the due diligence the deference that you indicated and not, I mean, I don't believe you have to give that kind of deference to whether he was transient or not because he never made the finding in the district court that this gentleman was evading. Well, let me ask you about that. As Judge Jordan points out, he comes very close to making that finding, but then he seems to back off from it and says, I don't really have to go that far because the transient lifestyle made it difficult for him to locate. So from your point of view, because under the law, if a defendant is being evasive, that counts heavily in the government's favor in dealing with cases like this. Is it your view that the judge came close enough to making an evasiveness finding that we should factor it into our analysis? No, I don't believe you should factor it in your analysis because I believe he didn't make that evasive finding for two reasons. One, someone being evasive doesn't go to the federal government and try to apply for things and give fingerprints. And two – Well, he says enough time had passed that he was no longer worried, and so he felt comfortable in making those kind of appearances and applications. May I respond to that? Of course. He was a green card holder that entire period of time. He had to report to immigration all the time as a green card holder. He had to have – It wasn't like he was going under a fake name or a fake green card. It wasn't like they pulled it. A green card holder has to report, and he did. And, I mean, he also – I mean, that isn't someone to me that's evading. It's someone using the same name, has a green card, has a bank account. I understand that he says it's close to evading because of the P.O. box and the house. That's the one factor he indicates. And as I indicated, and I think we indicated in our brief, there were many factors on the other side, and that's why I think you shouldn't factor that in. That's why he didn't make the finding. Quickly, your light is on, but would you comment on the nature of prejudice if we were to find that there was not reasonable diligence? I assume it would be your position that due to the passage of time, the great passage of time here, that general prejudice would be permissible, you wouldn't have to show specific prejudice? Correct. I just wanted to touch on that because on rebuttal you may want to respond to whatever the government says on that.  Thank you. Thank you. May it please the Court, Bernadette McKeown representing the government today. Judge Du Bois found that the government had acted with reasonable diligence. This finding was based on, fully supported by the facts and the record, the reasoning was sound, and it should be accorded considerable deference. Six years. And the most the government can muster is an occasional icy ping? Doesn't that trouble you a little bit? Well, certainly they could have done more in this period, but the reason that that is not problematic in this case is because as Judge Du Bois found, and as the 2010 and 2011 investigation confirmed, even if they took additional steps in that period of time, between 2005 and 2010, they were not going to locate the defendant because of his evasive lifestyle. How can you say that? They knew they had evidence from his co-defendant that he frequented a certain bar. Did they go to the bar? They knew an address where his mother and brother lived, where they interviewed. They had talked to his lawyer. Did they go back to talk to his lawyer? I mean, I'm bothered more by the numerous things they could have done that weren't done, and somebody eventually, I mean, in 2011, staked out the post office. Okay, staked out whatever. I mean, I don't know how you can say for sure they wouldn't have found him. How can you say that in terms of the things they did not do? In terms of the things they did not do, many of those things were done in 2010 and 2011. Did anyone ever talk to his mother? No one talked to the mother, no. But, Your Honor, that's not unreasonable. The experienced investigators, and you see this in some of the cases where there was testimony, that's something that they usually don't believe is going to lead to any information about someone's whereabouts. Well, you've got to try. In my mind, I mean, if something, I'd be surprised. If somebody was looking for my son, I'd be surprised they didn't ask me. But the point is, here, is when they did take what are reasonable and adequate steps in 2010 and 2011, and that's something the defense does not dispute, they didn't find the defendant. But that was a couple months. And then they were fortunate that he got arrested. But it could be that if they hung around that post office a little bit longer, they would have found him. Or he went to the bar. It could be. But, again, it's whether or not the efforts that were expended were reasonable, balanced against how this defendant was living, which was pretty much under the grid. Tell us what facts give rise to a finding of diligence. Diligence. Well, we have, I think that there's not much dispute that the efforts between August 2005, when the complaint warrant was issued, and November 2010, when the case was transferred, the collateral request was sent to L.A., that was reasonable diligence. And, again — Counsel, excuse me for interrupting, but even with respect to that 2005 collateral request, there seems a lot of uncertainty about what exactly was done by the authorities in California. There were, I think the information sent out there included five or six addresses. There's an indication in the record that there was never any attempt to go to those addresses to try to determine whether the defendant was there. There was no evidence as to what efforts the L.A. authorities did, if anything. And Judge Du Bois recognized that. He said, even assuming that they — Well, there was some evidence. I mean, I'm sorry to interrupt, but you say there was no evidence. Your opposing counsel in the opening brief, page 10, quotes Deputy Deegan, saying that when Deputy Dominguez finally did the things in 2011, that they were finally doing stuff that he'd asked them to do in 2005. I mean, isn't that evidence that they were asked to do things and they didn't do things? Well, if — Your Honor, that was in cross-examination, and that was — It's testimony. That was a series of questions about wasn't it appropriate that they took that step then. There's no question that was appropriate. Right, but I think you're missing the import of my question, so let me try again. Whether it's on cross-examination or not, one of the deputy marshals says when things finally happened in 2011, then they were doing things that I'd asked them to do in 2005. Is that not evidence that they, in fact, didn't do things for a whole long period of time that they had been asked to do? They did not follow up. We don't have evidence that anyone visited those addresses or spoke to the mother. The brother had already been talked to. There was a good reason not to go back to the brother. The house, they had already approached that house. We don't know what transpired during that interview that they conducted. But, you know, there was a reason for that. We don't know that it's an interview. We have evidence that someone went and asked if he lived there, and then there's countervailing evidence that all they did was say, Are you Sergio Velasquez? So there's two conflicting — Your Honor, the record is — I admit it's unclear on this point, but it's been described in various ways. And the report that Deputy Degin sent said that the occupants were interviewed, that four people were found there and they were interviewed. He doesn't say what those results were. When Agent Pedrini testified, he said they went to the house and they didn't find him there. They asked for him. But there was no elaboration on what that discussion was. But even leaving that aside, yes, there is no question that things were not done in that time frame. But we have to go back to the bigger picture here, because what is reasonable diligence? It is one way of looking at who's responsible for the delay. That's what Barker talks about. What is the reason for the delay? And Doggett — Well, how can Velasquez possibly be the reason for the delay here? He didn't move — Because of his — he was either actively avoiding apprehension or he lived in a way that it made it — as this is Judge DuBois' finding, he lived in a way that made it very difficult to locate him through conventional — Why? Where did he live that made it difficult? We don't know. To this day, we do not know where he lived in that time frame. He used an address — Somebody could have figured it out by asking the codefendant. Are you arguing for a rule of law that says people who aren't fortunate enough to be well-rooted in society, they don't get the benefit of the Sixth Amendment? Well, Your Honor, no. You know, if you're, quote, transient, well, we can wait six, seven years because it's hard to find you. This is not near transience. This is somebody who — he's a drug dealer. He delivered nine kilos of cocaine. He is living in a way that — Counsel, stop. Stop. Counsel, stop. Let's stick with what Judge DuBois said, all right? That's what we're reviewing. He walked up to that, but he didn't say, you were trying to — I don't have to say that this person was actively avoiding being detected. So what he did say was this was a person living in sort of a transient lifestyle. So that's a real question. He doesn't term evasive, Your Honor. I think there's a difference between evasive lifestyle and a transient lifestyle. The Mundt case that he relied on talked about a transient lifestyle, but here we have — There are a lot of people who just — who get their mail in a post office box. My sister gets her mail in a post office box. And people who, you know, use a different address. They don't want to be harassed or whatever. They don't want people to figure out where they are, and that's up to them. But they have a motor vehicle license. They have a green card. They have other things. They report to their immigration official. And they're the only things that we know were in his need. But what supports the finding of evasion? What fact? Perhaps the better way to describe it is he's not living openly and notoriously and in a manner that made it, I think, possible. Now, I shouldn't say possible, but made it reasonable for the authorities to find him using their normal investigative techniques. What was secretive about how he lived? Never using an address where he did not reside for this period of time. Using P.O. boxes. People do that to get health insurance. And he switched the P.O. box. Sometime after 2005, he starts using a different P.O. box. He leaves no paper trail. When they go into LexisNexis in 2010, they can't find any new evidence, any new information about this man. But you're assuming that everybody has paper trails. I mean, I think probably 20% of the country has actual bank accounts. I mean, a lot of people live in a way that is not perhaps the way you and I live. And yet to say that they're evading is. . . Well, they are living in a manner to fly under the radar screen. This is somebody who at that point in time was dealing drugs. What obligated him to live in a style that would make it easier for the government to detect his whereabouts? Where does that obligation come from? He has no obligation. But I think what we're missing here is that. . . But why then, in the absence of such an obligation, why does it count against him in the kind of calculus that we're supposed to do? It goes into the balancing test of what effort the government has to exert. The case law is clear. If somebody is living openly and notoriously, the government has to make a serious effort or it's negligent. But if somebody is doing something to avoid detection, and as the monkeys sound, living in a way to avoid detection, the government's efforts have to. . . Counsel, now you seem to be begging the question. The question that's been put to you is, if he doesn't have an obligation to live, quote, openly and notoriously, and I think you've acknowledged he doesn't, how does it help you to keep going back to that and saying he wasn't living openly and notoriously? The burden here appears to be on the government to show some reasonable diligence. So the question is, what is reasonable about the behavior of government agents going to one address once and then doing nothing but checking the NCIC database annually for five years? That's the question you have to answer, right? Yes. Okay. So explain to us how that amounts to being reasonable. And as you do, I want you to pay attention to this line from the Supreme Court from Doggett, condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned to low prosecutorial priority. That's language that I guess we have to have in mind. So with that in the background, what was reasonable here? My point is that the reasonableness of the government's efforts have to be viewed through the prism of what information was available out there about this individual, and there wasn't much. And there was nothing that tied him to a specific location, despite even in 2010 and 2011, they didn't make any headway on figuring out where this man was. And in that sense, the 2010 and 2011 investigation shows that even with reasonable and additional investigative steps, they couldn't find this man. That's not really true. He went to that post office. They said, the people there said, oh, yeah, we know this guy. He comes in here all the time. They said regularly and they couldn't describe, they didn't give any other information that the agent sat there. Yeah, but so they staked it out for a half day. Do you not think if they'd staked that post office out for several days? Well, they might have had to be there for two weeks, Your Honor. We don't know what regularly really means in this context. So it becomes a resource allocation. But there needs to be an investigation. And until that time in 2011, there really wasn't any investigation. There were no affirmative steps taken. And even the request to California, no evidence that anything was done or that anybody checked on it. So we have up until 2011 really when nothing was done. Correct? We, there was, between November of 2005 and November of 2010, the only evidence in the record is that authorities periodically checked the NCIC. And that's not diligence, is it? That really can't be diligence. Or else everybody would just be pushing a button. And then speedy trial, 10 years of pushing a button. Well, it may not be diligence in that time frame. But my point is that the later investigation confirmed that even had they taken all those steps. You seem to be making a sort of bookend type argument. Your position seems to be that in 2005 they were reasonably diligent. Then there's this period of six years and seven months where they do virtually nothing other than this annual check. And then in 2010, 2011, they are reengaged. And, again, there's a more active search. You seem to be taking the position that because of what happened in 2005, and then later in 2010, 2011, that establishes a reasonable diligence. And what happened, the inactivity in between doesn't really count for anything in your analysis. It establishes that the government's efforts were not unreasonable over the context of the entire course of the investigation. If I could just maybe perhaps the more appropriate focus is the real issue is who's responsible for the delay? Who is more responsible, the defendant or the government? That is the issue.  Because he talks about their inability to locate them. He stresses that in the 2010-2011 time frame. And that's not an unreasonable conclusion. Can I ask you this? Sure. There's some period of time at the outset of their search for Mr. Velazquez where the authorities are in touch with his attorney. That's mentioned in the briefing. There's some effort to negotiate a surrender. And yet when the superseding indictment comes down, the first indictment in which he's named, it appears that that's not sent to the lawyer. There's no effort to contact the lawyer and say, okay, there's now an indictment. How do we stand? Is the guy going to surrender? Does that bespeak a lack of diligence? Should that factor into our consideration when we're thinking about whether the government was behaving reasonably or not? They know the guy's represented. They've talked to the lawyer. They know evidently that the lawyer is in touch with Velazquez. And yet the indictment comes down, and they don't even call the lawyer. Do we draw anything from that? I don't believe so, Your Honor. And it's clear that, first of all, the lawyer was the one who reached out to the prosecutor in our office. So Mr. Velazquez was well aware of what was going on. All the worse for the government, right? If defense counsel is the one making the call in the first place. Well, we wouldn't know who he was represented by, Your Honor. I mean, my point is he retained a lawyer to contact the government to find out what was going on in Philadelphia. There are discussions that occur between August 3rd when the complaint or whenever it was, the complaint warrant was faxed to Mr. Kaplan. And then after that there were negotiations that went back and forth until November 1st. Yes, after that there was no further contact. The indictment was returned, the superseding indictment was returned a few days later, a few weeks later. If you know you have a source who is in touch with Mr. Velazquez and you have a significant development in the case, like the return of an indictment, what's the excuse for not reaching out to that known source of contact and saying, this is what's out there now. You should talk to your client. How about you bring him in? I mean, there's nothing. Yes, Your Honor, and I don't know exactly what transpired in those conversations. I don't know whether there was some discussion about, well, we're going to have to indict him soon. I have no idea. So, yes, perhaps that would have been a better course. But the bottom line is Mr. Velazquez was well aware that he was not only under investigation, there was an arrest warrant for him. I'm not suggesting that he did not know he was wanted. I am suggesting that if we're asking the question about what's reasonably diligent is a failure to reach out to a known contact, the lawyer for Mr. Velazquez, a problem for the government in making the assertion that the efforts here were reasonably diligent. And I hear you saying it shouldn't matter. Is that right? I believe in the scheme of things it shouldn't matter. It shouldn't weigh heavily, certainly, because there was communication. There was back and forth discussion. Certainly it was, I'm sure, understood that there would be charges that arose from this. Quick question on prejudice. Prejudice, that's what I was going to say. If we were to find there was not reasonable diligence, would there not, and given the delay here, would we not find that general prejudice as per Doggett? Well, Doggett says that if the delay is attributable to government negligence, then there's a presumption of prejudice. However, that presumption is rebuttable. And in this case, I think this is one of those rare cases where the government can rebut that prejudice. This is a case where all of the crucial evidence is preserved. That's the evidence in the government's favor. But nobody's had a chance to build a defense or to even say what the defense would be. But if you are, and you have to look at the evidence to know, I mean, to even suggest that there would be a defense. But there's no evidence of the crime here. We're talking about evidence of delay. We really haven't, I mean, there was really no defense mounted because he pled. He pled guilty. Yes, Your Honor, but the evidence that is outlined in our briefs, everything was recorded. All the meetings, the negotiations. All the evidence that you want to present is recorded. But, Your Honor, how do you refuse? There's no viable defense. But, Counsel, you seem to be saying that the government can rebut this presumption of general prejudice by putting the burden on the defendant just to show specific prejudice. That seems to be what you're arguing. No, Your Honor. The standard that was in the dogged footnote 4 says if the government can show that the defendant's defense was not impaired. And this is one of those cases by the delay. The defense is not impaired by the delay. The main co-defendant testified already. The other co-defendant testified at a trial. Their testimony is memorialized. They can't, they really can't. There's impeachment evidence and they can't fabricate new evidence. And also, the evidence itself in the investigation, everything that was critical was recorded. They recorded the meeting where he agreed to deliver nine kilos of cocaine and said, here's my associate Curiel and he'll be the one, he'll be the contact person. So the evidence was preserved. There really is no viable defense. It's one of those rare cases. In most cases, the general presumption of prejudice would carry the day. But we think it shouldn't do so in this case.  All right. Thank you very much. Mr. Kavanaugh? Mr. Kavanaugh, you were the lawyer who was originally contacted, and you are still the lawyer, correct? I am, and I am. What can I say? Yes, I am. But let me, but first the, I mean, the idea that six years, seven months, they did nothing but check NCIC, and then the argument is, but even if we did something, we wouldn't have found an argument, which the government raises at this point, which I believe she raised with the court. And that argument, I mean, number one, in 2011, they were hot on his heels. If he happened to get caught somewhere else, they were hot on his heels. They knew he was going to immigration. Immigration didn't want to deal with him. I don't know why. I mean, I think they've changed their tune now. Homeland Security would be different today. Well. But they were closing the net. Sure. Nobody suggests that there couldn't, and the government admits, more could have been done, but that question of more could have been done isn't really the issue. The question is, was what was done enough? And in asking the question, was what was done enough, isn't it fair to consider the likelihood of success of an investigative step before you take it? In other words, if they go early in the stage and they look for the man and they can't find him, and the trail appears to these investigators to be pretty cold, what's unreasonable about them saying, let's wait, we'll check periodically the databases, and we'll see if something pops, because that's our best way to find this guy next, instead of staking out a random street corner and hoping we find him, or staying at the post office for three weeks, which we can't really afford to do with our manpower. What's unreasonable about the government making resource allocation decisions in that fashion? They didn't make a resource allocation in that fashion. In fact, they sent a supplemental request that they did nothing on. It wasn't a plan. What they did is they drafted a document that said, here's what diligence looks like. Go do this. Well, when they post one of those warrant notifications to NCIC, that's effectively a statement to the entire law enforcement community in the United States of America. This is a guy we're looking for. If you come across him, we want to talk to him. That's a pretty powerful broadcast, isn't it? Well, it's only if he gets stopped by the police, because the problem with an NCIC, it doesn't say go to this house and talk to him, go to this house and talk to her, go to the DMV and pull his driver's license. All NCIC does is, and it doesn't work all the time, as we know about his traffic stop where they didn't even pick him up, even though he used his correct name. Things don't work flawlessly. That's a fact. I hear you. But all I'm saying is NCIC just says, if you're stopped by the police, come and pick me up. Well, would you agree, though, that results or expected results are a fair factor for government investigators to take into account when they're deciding what should we do? Without a doubt, they have to take in what kind of investigation would be best suited for this case. So if they say, based on their initial investigation, our best move now, given resources, is to wait a bit, use the databases, see if something moves out there that shows us where he might be. If that was what they testified to, and if that was the game plan, to wait six months, wait three months, wait nine months, at some point, don't you get into a point where you say, I'll wait six years, seven months, to see what's best? Isn't, at that point, a little prejudice to the defendant? Because isn't the speedy trial right affected then? I mean, when do you want to wait? Can you wait 30 years? Sure. You're definitely moving to the question of prejudice. Let's leave that to the side. I'm trying to focus on Judge Du Bois' statement that, under the circumstances here, he thought it was enough. And trying to get you to respond to that discussion by Judge Du Bois. Well, that's why I believe I am responding. Let me see if I... They had a game plan, the supplemental, go do this, go to the six places, do this, do that, do this. That was their game plan. They didn't intentionally say, I'm just doing it in CIC. They fumbled the ball for six years until someone picked it up. Their strategy was wait three months, wait six months. But what I'm saying, Judge Du Bois said, that was enough with the NCIC. But it wasn't their strategy. It wasn't diligent. They knew what diligent was. They had a blueprint. What they had in 2011 was the same blueprint. And they were hot on his heels. But the blueprint got lost. And should we, in hindsight, say the blueprint, they decided not to do it? But that's not what happened. In this case, if their game plan is to wait six years or seven months before they do the supplemental to do that investigation, don't we run into the speedy trial at some point? And doesn't that answer the question as to, was it intentional that they did not go and do the supplemental things in 2005? Could you address the issue of prejudice? I mean, I believe Doggett plainly points out, and so does Barker, six years, seven months is prejudicial. Witnesses' memories fade. Well, in Doggett, there is a footnote that says they're trying to, while the government ably counters Doggett's efforts to demonstrate particularized trial prejudice, it has not and probably could not have affirmatively proved that the delay left his ability to defend himself unimpaired. I mean, what particularized trial prejudice would you offer? Well, you know, I have to cross-examine the other players here. My client wouldn't remember everything. They wouldn't remember everything. Remember, there's other players here. There's agents here. There's a lot of things to cross-examine in a trial. And one of the things that I think Barker and Doggett say, it's the memories of people. I mean, there's certain, no one wants to get tried for a case 20 years old. I've tried them. They're very difficult because no one seems, or six years, seven months old, I've tried those two. They're very difficult because no one seems to know what happened. And that's what these cases are. It's more prejudicial if the government has tapes that are clear and everything else is foggy. Exactly. How do I, I mean, I've got to counter those things in defense. Anything further? No. Anything further? No. Thank you very much. Thank you. I think the case under advisement is well argued. Call our next case. MR versus Ridley School District. Thank you.